The first of these is number 15-1557 Endotach LLC v. Cook Medical. Mr. Souter. Good morning, Your Honor. Good morning. May it please the Court. Good morning. Part of this appeal is a laches case, but as of yesterday, in the Supreme Court's decision to grant cert, it's questionable whether laches may still be a defense in a patent case. That remains to be seen. But in any event, there is no laches here, and especially as a matter of law. Appellant, we presented evidence on each and every element. We presented our own evidence such that we burst the presumption bubble as required by the panel decision in SCA. That then shifted the burden to the defendant, Appellee, to come forth with evidence. They did not do that. We showed evidence of delay that was either, as the SCA case, was either a reasonable jury to, excuse me, could conclude that the delay was either excusable or not unreasonable. And we showed that there was no evidence, as a matter of law, because we moved for summary judgment, of either prejudice, evidentiary or economic. On the evidentiary prejudice point, the briefs are not entirely clear what's going on here. As I understand it, your effort at trial would be to swear around a piece of prior art. And some of the evidence in question here relates to that issue, and that is the native conception and diligence and reduction to practice, and some of it relates to the infringement issue. Am I correct about that? Yes, Your Honor, but the evidence on prior art and conception was the Lee reference, and Dr. Lee was deposed and questioned. Yes, I understand that, but the effort was to show that Dr. Rhodes conceived the invention and was diligent in reducing it to practice before the Lee prior art, correct? Yes. So why isn't some of this material, documents, and potential witness testimony that allegedly was lost relate to that issue? Your Honor, very simply, Dr. Rhodes passed away in 2000. Prior to Cook having the product put on the market in 2003, his wife, his longtime assistant, and the prosecuting attorney produced the records that they had. Mrs. Rhodes testified that her husband would keep notes on a napkin, but after the patent application was filed, he threw them away, which would have been in the early 90s. Well, she said that in 2009 she believed that she threw away some material when she moved, right? She moved when he was sick, which again was prior to 2003. He was in New Jersey. I thought she testified that she moved in 2009. Am I mistaken about that? Yes, Your Honor. I believe she moved to Florida before he passed away and then raised her family, her small children, and went back to work in Florida, in West Coast of Florida. But, Your Honor, the point is on evidentiary prejudice, and this is the – we cite the James River case. Cook has to show that they were denied the opportunity to present a fair and full defense, and that case cites alchemy, and how the lost evidence is important to the defense. Memories fade. People don't remember. But here they presented three summary judgment motions, eight defenses, 70 exhibits. Where is the testimony or evidence that they were denied the opportunity to present a full and fair defense on each of the issues in the case? 30 v. 6 witnesses don't remember lost evidence. Well, if there's a presumption that applies here, your comments are presupposing that it's their burden to prove all this prejudice. If a presumption applies here, then isn't it actually your burden to overcome the presumption, not their burden to prove? Yes, Your Honor. Yes, Your Honor. And we submit that we presented sufficient evidence, our evidence, of when Dr. Rhodes passed away, when Johnson & Johnson did their license six years before the product and put it in a drawer, when Mrs. Rhodes had to go back to work and raise her four children, and that Cook studied our patents in 1993 and again in 2007, and with their counsel used our patents as a sword to assert as a defense to another patent infringement suit. So the totality of it— Why would Mrs. Rhodes going back to work be an excuse for why she didn't pursue her legal rights via latches? Because if it was, wouldn't it pretty much give everybody an excuse? We all work. We all have children to raise. I mean, wouldn't that be sort of a built-in excuse all the time for unreasonable delay? Yes, Your Honor, and this court and other courts have held that that is not enough. But you have to look at the totality of the circumstances, and that's just a factor that goes into the circumstance of whether or not the delay was excusable or not unreasonable. Those are determinations, and the underlying facts of delay, whether it's evidentiary prejudice, whether it's economic prejudice, as this court held in SCA, are questions of fact that are reviewed by this court if whether we presented sufficient evidence made a prima facie— I'm not sure why you keep referring to the SCA panel decision. I mean, that was vacated by the Embank decision. Yes, Your Honor, but the Embank issue had—the Embank case had a specific issue— Right, but it was still vacated. It's not precedent anymore. Yes, Your Honor, but it is—I can cite the Aukerman. I can cite the Hemstreet. It's just the latest pronouncement of the case— Well, it was the latest pronouncement until the Embank court vacated it when it granted Embank. Yes, sir. Yes, Your Honor. Well, I'll cite Aukerman. Hemstreet is a fair decision on what is required. It all goes back to the Aukerman case. What precisely is your argument as to why the delay was excusable? Because a minute ago you were talking about Mrs. Rhodes and her work and her raising children, but then your very sentence morphed into prejudice and these other things, but these are each discrete issues. It's not that we consider on a totality of the circumstances all of them in a lump sum, and if cumulatively you raise a question of fact somehow to the ultimate issue, it's we have to look at each of these issues. We look at delay. Did you raise a question of fact about delay that should have precluded the judgment? Did you raise a question of fact about prejudice that should have precluded the judgment? So where is your evidence related to delay? Is it only Mrs. Rhodes and her other obligations? Yes, Your Honor, and yes, and I'll be honest with you. Our focus of our briefs and it is either delay or prejudice, and we move for summary judgment ourselves at the district court that as a matter of law they could not show prejudice. So yes, we are including everything, but our focus is on prejudice, both evidentiary and economic. We raise facts. It's not to say you're giving up on the delay argument. I'm not giving up on delay, but I'm leading with prejudice. I think it's – in a legal setting they're different, but when you look at the facts, sometimes there's a fine line and it's hard to draw whether this goes to delay, this goes to prejudice. Our main argument here is that they could not establish prejudice, either prejudice as a matter of law or as a matter of fact, but at a minimum they could not grant summary judgment on the issue of prejudice because we presented sufficient evidence to burst the bubble, and they did not put forth any evidence of any nexus on economic prejudice. We can see that they say they spend millions of dollars in product development, but how is that a result of the delay when the evidence showed that they studied our patents in 1993, they studied our patents in 2007, and when we asked them in deposition, what is your evidence to support your position of latches, and they refused to answer on the basis of objection. They didn't show – I'm sorry to run the site XCA, but there the facts were that they said they bought a business that they wouldn't have bought. They did other things. Here all they say is we invested lots of money, and that's not the appropriate nexus under the case law to establish economic prejudice, and on evidentiary prejudice I cite to our reply brief where we outline each witness that was deposed, every document that exists was produced. The other side says we didn't produce from these witnesses, and we explained how they were all produced under an end-attached base label. What is the significance of their knowledge of the patent? It's not the knowledge of the patent alone. It's that they used the patent. They sought legal advice. Their trial counsel affirmatively used the patent and studied the patent. What does that show? That shows that they – if they studied our patent and knew of our patent and evaluated our patent under the cloak of privilege, what are the inferences of that? Did we present evidence that that shows something more than those? The inference is that they knew about the patent and they knew you weren't suing them. Yes, but maybe the circumstances were such they evaluated that Dr. Rhodes was deceased. Again, it's the inferences of summary judgment. It's not just that we wrote him a letter. When we asked them what did you do in reliance on knowing about our patent, they said, I can't tell you. It's privileged. I don't see how that supports you, though. I'm in the same camp, I think, as Judge Dyke, whereas I don't see how their knowledge of the patent establishes that latches shouldn't apply based on your unreasonable delay. Your Honor, yes, I'm talking about prejudice. They have to show a nexus. No, no, you have to overcome. Yes. It's not that they have to show a nexus. You have to overcome the presumption. Yes, and I have to overcome the presumption on both delay, that it was either excusable or unreasonable, and the issue is or put forth evidence of no material prejudice. If I put forth evidence of either one, then the presumption goes away. What's your evidence of no material prejudice on the economic factor? They did not make any change. So this is the problem I'm having, is you're basically, every time we ask you about what specific evidence, you're saying they didn't show something. But in this case, assuming we think the presumption applies, and it seems to, it's your burden to put forth evidence, and you're kind of essentially arguing that because they didn't put forth any opposing evidence, they shouldn't get summary judgment, which leads me to the conclusion that you think they should never get summary judgment in favor of latches. Your Honor, we asked them, what did you do when you learned of the patent under a 30 v. 6 witness, and they refused to answer on the advice of counsel. So we are left with this, we couldn't find out that way. Also, what we do know is we asked them in an interrogatory answer, which is in the record A4330, and we said, what non-infringing alternatives could you have taken advantage of? And their answer was, the non-infringing alternative is the accused device. There is no non-infringing alternative. So what could they, we asked, what would you have done differently? How would you have responded differently? We know you knew of the patent, what actions did you take? And they foreclosed us from finding out. And when we said, is there a non-infringing alternative? So do you think an absence of evidence on their part is enough to create a genuine issue of material fact on prejudice? Under these facts, yes. When we did everything we could do. It seems to do away with the presumption. I mean, you may have a very good argument that the presumption is kind of flawed in these kind of circumstances because there really is evidence in their control, but that's the law still. Your Honor, yes. The question is, you start with a presumption. Did we make a prima facie case to show either the lay was excusable or not excusable or prejudice? And if we make a prima facie case, that's all. We don't have to prove it. If we make a prima facie case, the presumption goes away and they have to come forth with evidence of what they did. We asked them and they didn't tell us. Under that record, I don't see how as a matter of law you could find the economic prejudice. Okay. You're into your rebuttal time. I'll give you two minutes. Thank you, Your Honor. On the other issue... No, we don't have time. Oh, oh, okay. Unless you can use your rebuttal time. No, I'll save it. Thank you. Mr. Zanfordino? Yes, good morning, Your Honor. It's been a pleasure to court. Before I begin my prepared remarks, I'd like to answer the one question about Brenda Rhodes and what happened in 2009. So she had testified that there were scraps of paper that she or her husband asked her to keep, notwithstanding what they've said, that she threw everything away back in the 80s. And we tried to get those documents because, as you pointed out, there was this Lee reference that we had shown would have otherwise anticipated the Rhodes patent unless they were able to predate it under 102G. And she testified that in 2009 she had moved, and it was sort of a hurried move, and documents had gotten lost. That's in the record. We cited that in our brief. So I wanted to make sure I answered that question. Now, the other point is about the presumption and the discussion about the reasonable delay. Their briefs, I'm surprised that they're raising it here because their brief makes no attempt to... I'd really rather you focus on prejudice. Please tell me how you were prejudiced. Both economic and evidentiary? Wherever you'd like to start. Okay, so on the economic side. So we had retained an expert. Their focus is the question of whether we had shown a nexus. So we had retained an expert, Vince Thomas, specializes in looking at economic data and those sort of things. And he had noted all the investments that went into the development and the marketing and the FDA approval for these products. That's not disputed. The question was this. So by the time they had notified us of an alleged infringement, the 154 patent had long expired. So how is it that we can make any change in a product? How can we do anything? We can't turn the clock back, right? So by waiting so long and waiting until after the patent expired, that effectively foreclosed us from doing anything. Did you already know about that patent? So that's a good question. I guess it depends what to know means. So there were folks within the large Cook family of patents that had knowledge of the family of companies that had knowledge of the patent, as you can tell from the privilege level. So what you don't have, unfortunately, in the record is the actual interrogatory. So they've pointed you to the interrogatory answer that says, tell us when you found out. Well, the actual interrogatory, and I can send it to you in a letter, defines you to be Cook and all its predecessors and successors and affiliates and related companies and that sort of thing. And so we were responding to that interrogatory. So we went to all the affiliate companies and looked at all their documents and said, okay, now, anybody ever see this patent? Once we got those documents, we put them in the law. They're trying to say now that that large body of knowledge spread out a bunch of different affiliates and predecessors and successor companies all becomes the knowledge of Cook Medical. That's just not the case. So are you saying Cook Medical did not have knowledge of the patent? When it was sued, yes. No, prior to being sued. Are you saying... You're telling me all these documents went on the privilege log, and I'm wondering if you're playing a shell game with me. Are you telling me that Cook Medical was not one of the Cook companies under the Cook umbrella that had knowledge of the patent prior to being sued? Cook Medical... I don't remember the exact date when they came into existence. There were predecessor companies, Cook Incorporated, Cook Group, Inc. They're listed in the record. The actual entity that's in this appeal, Cook Medical LLC, previously Cook Medical Incorporated, didn't exist back in 1993 when there's a privilege log. What's the answer that we don't know, whether Cook Medical and its predecessors had knowledge of the patent or not from this record? I think that's the answer. I think the bigger question is, so what? I mean, having knowledge of the patent... When you say that's the answer... No, you know. These documents on the privilege log demonstrate who knew and as of what date. They're just not part of the record, right? So you do know the answer to this question. Me personally, I do not. Somebody knows, right? But it's not part of the record, so there's no evidence. That's our point. This is all about whether... Let me ask you this. We're on summary judgment. Since you can't answer this, isn't the inference drawn against you that you knew about this patent  and we have to move on from that, and you can't claim lack of knowledge? If you're trying to draw an adverse inference from what's on the log, I would suggest that that's improper. Not from what's on the log, from your interrogatory disclosure. Your interrogatory disclosure says, yes, we knew about it in advance. And now you're saying, but we, we don't know. You don't know which company we are, and it's all hidden in these privilege documents. So why isn't Judge Hughes exactly right that drawing adverse inference in light of your admission in the interrogatory would establish your advanced knowledge? So let's accept that that's the case, that Cook Medical has some collective knowledge based on... Because we have to accept it under the summary judgment standard. Okay, then let's accept that. My answer to that is, so what? I mean, under all the cases, they've never cited a case that says just knowledge alone of a patent somehow forecloses reliance on a... Well, but doesn't it reduce the prejudice that you likely suffer? Because many, many, many of these laches cases that we have do not involve now a company that had knowledge of the patent. And so you can understand why a company proceeding on its course of business development in the absence of any knowledge of a patent would be much more prejudiced than a company proceeding in its course of business with knowledge of a patent, maybe even having sought opinions and being concerned that this very patent reads on their device. You can see that the prejudice could be quite a bit stronger in a scenario where there isn't knowledge, right? But Your Honor, for example, when you say being concerned about whether this patent reads on their device, you're starting to draw adverse inferences, I think, about what that evidence would be. Yes, but isn't that what we have to do in summary judgment, is draw these adverse inferences. But not based on the assertion of the attorney-client privilege, you can't. I don't believe so. So it seems to me your argument is we've met the standards for the presumption. Absolutely. And we refuse to answer any questions about our specific reasons, even though we knew about this patent, for why there's delay. So therefore, we're entitled to summary judgment. That can't be the case. Well, they could have gone... That makes the presumption automatic. Well, there's lots of different ways to rebut the presumption, right? They chose a particular... Let's just talk about the economic things. I mean, on that, basically, if you meet the presumption, they have to show that you didn't rely on the lack of suit or had some other reason for going forward with your business plans. Or they could have discovered, if you didn't put forth the privilege, that you looked at this and said, well, we don't think they're ever going to sue on this because the inventor is dead. And that would show a lack of prejudice. But if you don't answer those questions, then how are they ever entitled to find out the reasons for why there's no nexus between your knowledge of the patent and your economic plans? So your Honor said rely? Rely on the delay? With all due respect, I don't think that that's the test. I think it's the question of whether the prejudice results from the day. It's not a question of reliance. Well, let me be clear about what you were asking. Now, certainly they could have asked whether Cook Medical was aware of the patent. And you said they didn't ask that question. They asked a broader question. Correct. So what are the questions that your client declined to answer on the grounds of prejudice? I mean, on the grounds of privilege. Which questions specifically?  that they didn't get an answer to on the grounds of privilege? I don't know specifically which questions that they think matter. I think that's a better question for them because they have the burden of proof on that. But you know what they asked. What did they ask? So, in the interrogatory, it says state when you became first... No, no, no, I'm not talking about the awareness. They could have asked you when Cook Medical became aware. They didn't ask. That seems to me to be their problem. They didn't define the question properly. But they asked other questions about why you did not... weren't concerned about the patent. What did they ask? I don't believe they ever asked that. They never asked that question. How did the privilege issue come up? The privilege issue comes up from the privilege log. That's the only place that they're pointing to is a privilege log. They were never going to be able to take a privilege log. In other words, they didn't pursue the reasons that you went ahead apart from reading the privilege log and saying that certain documents were privileged. That's correct. They looked at the privilege log and they said, look, here's an individual who seems to be an employee of some Cook company. And we gave detailed log entries. We weren't trying to hide the ball where it might say something to refer to one of the patents in suit. So they never asked why did you go forward with this when you had knowledge of the patent? Correct. That's correct. There is no such question. But I'm looking at the privilege log and the privilege log reflects a lot of entries for things like letter slash report referring to the 154 patent reflecting legal advice and requesting legal advice. I mean, that indicates not only that you had knowledge but you put this on the privilege log and it pretty strongly implies in an adverse inference world that you were also seeking legal advice about whether you infringe that patent. Doesn't it? I would say no. There's nothing in there about whether we infringe that patent. It's just legal advice about the patent. If I go further, I run the risk of waiving the attorney-client privilege. If I had that document in hand right now, they don't. Did they ever seek to overcome the privilege? I don't recall that they ever moved to compel. But my answer to that right now would be no. They never got an order from Judge McKinney saying look, that reliance on the privilege was incorrect. You've got to answer that question. There was no such question. Go ahead. If I may, I'd like to turn to the non-infringement of the 407 patent. Unless you have any other questions on latching? I guess I'd still like you to tell me what the evidence of... Why don't you go through the evidence   the evidence of evidentiary prejudice. I mean, if you go through the evidence you really have to establish one of these two. You don't have to establish both. That's correct. So why don't you tell me the evidence of evidentiary prejudice. So it relates back to Your Honor's point about the Lee patent and the fact that we had uncovered prior art that predated their patent. And so they were going to try and leapfrog behind it with prior conception reduction of practice. So we had asked, well, who are your witnesses going to be? And they listed a Brenda Rose, who was the widow of the deceased named inventor, a person by the name of William Kafari who was a friend down in Florida, Dr. Rose's former secretary, Mrs. Dungan. And I believe those were the principal folks. So obviously we went and talked to each one of them. First was Brenda Rose. And Brenda Rose wanted to tell this whole story about what her husband had done. But she didn't have any documents. She talked about how he would sketch these things out. And we said, okay, where's those sketches and napkins? And she said, well, he told me to hang on to stuff. They say, no, I was told to throw everything out because it was too sensitive to keep around. Their point is, look, that hurts us more than it hurts you because we can't corroborate. But they weren't going to not tell their invention story. They fully intended, if they got to trial, to tell this invention story. They act as if we've already won an invalidity. We haven't won yet an invalidity. We would expect it to, but we hadn't. We didn't have what we were going to need to cross-examine her if Judge McKinney was going to let her tell that story. Next person was this friend, William Kafari. He supposedly had all these notes and meetings with Dr. Rose, and he was going to testify about what had happened and what he had seen. And he had said he had documented all these meetings. And when I asked him, well, where are those documents? What happened to them? He said, well, they were all destroyed in the deluge, the 2005 flood. I don't have anything left. Then their next witness who was going to try and tell an invention story was the secretary. Same thing. We asked, where's all your documents about what you had seen and done at the time? Don't have any more. And we'd ask him, well, what do you remember? He saw the list of things they couldn't remember, the I don't knows, I don't remembers. There was another witness. They're prosecuting against her. The one problem with the I don't knows and I don't remembers is none of them seem to go to anything important about the case. It's like if you asked me what I ate for dinner last Friday. I don't remember. But why does that really prejudice you? I didn't see how their I don't knows and I don't remembers hurt you in any way. I went through all of them. Couldn't find a single one that hurt your case. We never got that far to be able to see whether that was going to be the case, Your Honor. That's why this is summary judgment. But we had the Lachey's presumption on top of that, right? We had that as well. So those last few seconds that I have, I don't know if you have any questions, economic questions. Are these people that you've been talking about, Mrs. Rhodes, the friend whose name I can't remember, and the secretary, were they designated to speak about the conception and diligence issues in connection with the invalidity question? I'm out of time. Can I answer? Yes. Yes, they absolutely were. And an additional witness who I neglected to mention was Mr. Stein, the prosecuting attorney. He didn't remember anything. He didn't even remember prosecuting the 417 theft. We showed it to him. It was a complete surprise. So think about the fact that if there was a possibility that we could have had an equitable conduct offense, it's gone. He couldn't remember anything. He didn't have the documents. OK. Thank you, Mr. Zennifer. Thank you. Mr. Souter, you have two minutes. Yes. I'll be very brief. Two minutes, please. Thank you. It's not just the interrogatory answers, Your Honor. A6735 is the question, Your Honor, that you asked about what we asked, what do you know about latches? And there was an objection. Privilege. We're not allowed to answer. That's A6735. In addition to the privilege law, there were invalidity contentions in another case in 2007 with the exact same counsel where they had studied and asserted our patent in that case. So they did study it. And they bolded it. And that is cited in the record. So it's not just our interrogatory answers of the privilege law. To what extent did you pursue this question of what their knowledge and motivation was? Did you try to overcome the privilege law? No. We felt we had enough evidence because all we had to do was put forth some evidence to burst the presumption and the burden shifts to them to come forward with evidence. And they did not do that. Your Honor, on the evidentiary prejudice, all those witnesses testified. There were corroboration issues. How's the prejudice, as Judge Morgia said, if it doesn't hurt them, it hurts us. How is that prejudice to them? But all these witnesses produced documents. Well, that makes it sound as though if you have the burden of proof that the other side is not entitled to have the evidence that might overcome that. Were they given the opportunity to have a full and fair defense? Take into account that sometimes witnesses forget things happen. But were they given that opportunity? Well, if documents were destroyed, then you wouldn't have a full and fair opportunity because you wouldn't be able to cross-examine the witnesses using the documents. Your Honor, the witnesses testified that they were not aware of any documents that were destroyed that related to corroboration, conception, reduction to practice. And in fact, Mrs. Rhodes produced all the documents. What about all the napkin sketches? Those were destroyed in 1995, after the application was filed. We produced a videocassette that the Secretary transcribed dictating the disclosure for the original patent application. All of that was produced. Everything that we had was produced from 1993, 1994. But I thought Mrs. Rhodes testified that in 2009 she destroyed documents that were relevant to the time of the patent application. No, no. She said when she moved, and I apologize, I misspoke. She moved homes and got rid of stuff in her garage. She didn't say, oh, here's a file on my husband's patents and I'm throwing that out. She had the tape. She had other information. She had correspondence with Mr. Stein that was logged on our privilege log. Well, clearly she had some documents. The question is whether there were other documents that got destroyed. I thought she testified there were other documents that got destroyed. Not relating to this patent. She did not know. She moved 16 years later. But she testified that the documents that she was aware of, like the videocassette, and Ms. Dungan testified, and Mr. Khafari testified, Your Honor, on the 417 patent. I think we're out of time. We rely on the briefs of our other audience counsel. Thank you, Mr. Senior. Okay.